United States District Court
Eastern District of Michigan
Southern Division

United States of America,

        Plaintiff,

                                  Case No. 24-20532

v.

                                  Hon. Susan K. DeClercq

William A. Smith,

        Defendant.

_____/

# **Government's Memorandum in Aid of Sentencing**

William A. Smith, the former Chief Financial Officer of the nonprofit Detroit Riverfront Conservancy, embezzled over $40 million from the Conservancy in the span of just over 11 years. Smith spent the embezzled funds almost exclusively on goods and services for himself, his family, and his personal associates. Smith's lifestyle was lavish and his tastes extravagant. Over the course of his scheme, Smith spent enormous sums of money on basketball tickets, cruises, private jet travel, designer clothing, jewelry, and other trappings of wealth and comfort. Smith's gilded lifestyle came at the expense of the Conservancy and its donors, who entrusted Smith with ensuring that the

Conservancy's money was used for the purpose of enhancing the Detroit riverfront for the benefit of the city and the public.

To his credit, Smith pleaded guilty shortly after being charged for his criminal conduct and timely accepted responsibility for his actions. But Smith's offenses are remarkably serious and warrant a significant criminal penalty. Smith abused the trust his employer and his colleagues at the Conservancy placed in him in egregious ways. He was fully conscious of his guilt and took elaborate steps to conceal his criminal activity, including laundering money through various intermediaries, doctoring Conservancy documents and records, and taking out an unauthorized line of credit for $5 million to keep the Conservancy solvent while his scheme continued. Smith's crimes were not the product of a momentary lapse of judgment – they went on for years and involved hundreds of discrete acts of deception. And the scale of his theft is mind-boggling and could only be perpetrated by an individual of a deeply corrupt and depraved character. The government respectfully requests the Court to sentence Smith to 216 months incarceration and a three-year term of supervised release. The government also requests that the Court enter an order of forfeiture

and a restitution judgment of no less than $44.3 million, with the specific figure to be provided at sentencing.

## FACTUAL AND PROCEDURAL BACKGROUND

The Detroit Riverfront Conservancy is a nonprofit organization that was established to transform the Detroit riverfront from a largely neglected industrial wasteland into useable recreational space. Its mission is to develop the riverfront into an area where all members of the community can gather in a vibrant and safe space while enjoying access to the jewel of the city—The Detroit River. The Conservancy is a 501(c)(3) organization which envisions the creation of a continuous Riverwalk from the Ambassador Bridge in the west to Gabriel Richard Park in the east, along with plazas, pavilions, and green spaces.

Funding for the Conservancy is provided by both private donors and public grants. The Conservancy has also received federal grants through the Environmental Protection Agency as well as state funding. In 2020, for example, the EPA signed a $2.5 million agreement with the Conservancy to remediate contaminated sediment and create a new habitat along the Ralph C. Wilson, Jr. Centennial Park funded through the Great Lakes Legacy Act. The Conservancy is a model of how public

and private entities can successfully work together for the good of a community.

Since 2003, the Conservancy has invested hundreds of millions of dollars into the revitalization of the riverfront. This investment has paid off. Detroit went from having the worst riverfront in the nation to being voted the best for three consecutive years. More than 3.5 million people visit the riverfront each year.[1]

In 2006, Smith was hired by the Conservancy as Senior Director of Finance. In 2011, he was promoted to Chief Financial Officer (CFO). (PSR ¶13). As CFO, Smith was a high-ranking member of the organization, second only to the CEO. He was a trusted employee and was given broad authority to oversee and to manage the Conservancy's financial affairs. In this role, Smith had exclusive access and control over the Conservancy's bank accounts, including accounts at Comerica and Citizens banks. Smith was well paid for his work; he received a substantial six-figure salary, which placed him in the 95th percentile of wage earners in the United States.[2]

---

[1] https://www.detroitnews.com/story/news/local/detroit-city/2023/02/19/detroit-riverwalk-named-best-in-us-for-third-straight-year/69918864007/
[2] https://www.omnicalculator.com/finance/us-income-percentile

Smith's salary was one that most American wage-earners would find more than ample. But Smith wanted more – a lot more. Beginning in late 2012 and continuing through May 2024, Smith defrauded the Conservancy by systematically embezzling the Conservancy's funds and using them for his own purposes.

Smith's embezzlement took three principal forms:

- **First**, Smith diverted Conservancy funds from the organization's bank accounts to a bank account in the name of "The Joseph Group & Associates, LLC," an entity owned and controlled by Smith. The Joseph Group was not an approved vendor for the Conservancy and provided no goods or services of any kind to the organization. Yet, during his embezzlement scheme, Smith transferred approximately $24.4 million from the Conservancy's bank accounts to an account in the name of The Joseph Group. Often, Smith would transfer funds from The Joseph Group to another entity that he owned and controlled that, likewise, had no association with the Conservancy, First Round Management, LLC.

- **Second**, Smith maintained an American Express account in the name of another of the many entities he owned and controlled, this one called "William Smith & Associates LLC." There were four American Express credit cards issued on this account. Between November 2012 and May 2024, Smith used approximately $14.9 million in Conservancy funds to pay off purchases made on this account. None of these expenditures were authorized by the Conservancy, which maintained other credit card accounts for Conservancy purchases. Smith used the American Express account to purchase furniture, designer clothing, handbags, lawn care services, airline tickets, and other consumer goods and services for himself and his family.

- **Third**, Smith used Conservancy funds to purchase cashier's checks from various financial institutions. Certain of these cashier check purchases were unauthorized, and Smith used the cashier's checks for his own purposes without the knowledge or approval of the Conservancy's Board of Directors.

Smith used the money that he embezzled from the Conservancy to live a deeply immoderate lifestyle. He spent the Conservancy's money profligately, with no concept of thrift and little concern for the long-term value of what he purchased – after all, the money was not his. Smith bought considerable real estate, expensive clothing and jewelry. He purchased a thirty-five-foot boat, leased a $200,000 Mercedes-Benz, and purchased or leased other vehicles. Smith also used the stolen money to travel; he chartered a yacht for a Mediterranean cruise and a private jet to travel to Las Vegas.

Smith spent a considerable amount of this money on a female associate, S.R. Smith and S.R. become romantically involved and S.R became a principal beneficiary of Smith's largesse. For example, in January 2021, using Conservancy funds, Smith paid for the lease of a new Maserati Levante for S.R. Records from Jim Ellis Alfa Maserati in Atlanta, Georgia show that S.R. signed a contract for a three-year closed-end lease of the Maserati, with a one-time payment of $63,452.47. On January 22, 2021, Smith wired $68,000 from First Round Management, LLC to S.R.'s bank account. That same day, S.R. withdrew funds for a cashier's check for $63,452.47 payable to Jim Ellis

Maserati.  In the picture below, S.R. can be seen posing with her new

Maserati, paid for by the Conservancy:



This transaction is merely illustrative of Smith's extravagant

spending of Conservancy funds for S.R.'s benefit. Indeed, over the

course of his scheme he provided S.R. with nearly $3,700,000[3] in Conservancy monies. This amount includes only wire transfers. It does not include gifts, travel, or jewelry for S.R. that Smith charged on his American Express card. The chart below documents the wire transfers that Smith sent S.R. from 2013-2024:



In October 2021, Smith and S.R. charted a private yacht, called "The XO of the Sea," for a weeklong Mediterranean cruise. Smith paid a

---

[3] The $68,000 wire transfer for the Maserati lease payment is included in the bar graph total for all wire transfers from Smith to S.R. in 2021, nearly $700,000.

total of $100,016.13 for the rental of this vessel. A picture of the yacht is

below:



***Photograph of Smith taken in October 2021.***

Smiths' spending on S.R. represents only a portion of his profligate spending of funds embezzled from the Conservancy. Among other things, Smith also made the following purchases with Conservancy monies over the course of the scheme:

- Smith charged more than $526,000 on items from the luxury retailers Gucci and Louis Vuitton.

- Smith charged more than $507,000 on floor seats for Detroit Pistons games. His tickets grew more expensive over time – standard floor seats did not suit him, and Smith upgraded to floor seats on the hardwood, which were substantially more expensive.

- Because American Express does not allow charges to be converted to cash, Smith charged more than $500,000 on his card to the Conservancy, then withdrew the money from the Conservancy's account in cash.

- In June 2021, Smith charged a two-day trip to Las Vegas where he stayed at the boutique Cromwell hotel. While at the Cromwell he charged:

- ○ $8,219.01 at the "Drais Rooftop," an expensive Las Vegas entertainment venue;

- ○ $5,656.44 at the Drais Beach Club; and

- ○ To travel to Las Vegas, Smith chartered a private jet, round-trip cost was $94,023. In the photograph below, Smith can be seen disembarking the private jet:



***Photograph of Smith taken June 28, 2021.***

- Smith charged almost $45,000 to attend a Lions game at the L.A. Rams stadium in October 2021:

    o Smith rented a private suite at the stadium for $29,000;

    o $3,533.16 at the stadium suites restaurant;

    o Hotel accommodations for two nights at The Shay Ivy Station, a boutique hotel, $2,350.74;

    o Nusr-Et Restaurant, Beverly Hills, $1,686.28; and

    o $6,372.90 Louis Vuitton, Beverly Hills.

- Smith charged over $94,000 in airline tickets for S.R. and himself.

- In September 2022, Smith charged $54,400 at Golden Sun Jewelry in Southfield, Michigan.

- In March of 2019, Smith charged $24,989 for deposit for a wedding venue in Mexico.

- In June of 2020, Smith charged another $35,000 for the wedding venue in Mexico.

While Smith spent Conservancy funds with abandon, he also engaged in various practices to cover up his long-running fraud scheme. Smith was cognizant of the risk of detection and took a number of steps to ensure that his embezzlement remained undiscovered and could

thereby continue. Smith falsified bank statements that he provided to the Conservancy's bookkeeper, altering or deleting unauthorized transfers on the statements in order to keep them off of the Conservancy's books. Late in the scheme, Smith became alarmed by the low balance in the Conservancy's operating account, which threatened insolvency and could have led to detection.

To remedy this problem, Smith took out a line of credit with a financial institution (Citizen's Bank) on behalf of the Conservancy. Smith claimed to be acting with the authorization of the Conservancy's Board of Directors in taking out this line of credit. In fact, Smith had no such authority, and the documents he provided Citizen's Bank purporting to show that he had such authorization were forgeries. Smith used the funds from this line of credit (which eventually totaled $5 million) to infuse monies into the Conservancy's bank accounts to help cover up his substantial embezzlement from those accounts.

After purloining all of this money from the Conservancy, Smith also took complex steps to conceal the source and nature of the embezzled funds. An example of this can be found in Smith's movement of money in September 2021 in advance of his purchase of a home in

Texas. On September 24, 2021, Smith wired $98,600 from the Conservancy's account at Comerica Bank to The Joseph Group's account at Bank of America, one of the many unauthorized transfers of Conservancy funds Smith made to that entity. The same day, Smith transferred $65,000 from The Joseph Group's account into another Bank of America account held by "First Round Management," another Smith-controlled entity. Three days later, Smith transferred another $33,000 from The Joseph Group's account to the First Round Management account. On that same day, Smith transferred funds from the First Round Management account to a bank account at JP Morgan Chase in the name of "YBE Food Group," yet another Smith-controlled entity. YBE Food Group maintained two accounts at JP Morgan Chase. Funds from the YBE Food Group account that received the transfers from First Round Management were later transferred to the other YBE Food Group account. Smith then transferred funds from that second YBE Food Group account to his personal bank account, which was also maintained at JP Morgan Chase. The funds transferred from the YBE Food Group account to Smith's personal bank account were among the funds Smith used to purchase a cashier's check on September 27, 2021

in the amount of $429,034.62. Smith used that cashier's check to purchase a residence – in cash – in Cypress, Texas in October 2021. The elaborate financial transactions described above – beginning with the transfer of embezzled funds from Smith's Joseph Group account to his First Round Management account – were all intended to conceal the source and nature of the Conservancy funds Smith embezzled.

Following a March 2024 Board Meeting, the Conservancy's leadership became concerned about the financial condition of the organization and grew dissatisfied with Smith's evasive answers on the topic. In April 2024, Smith became physically ill and took a leave of absence from the Conservancy. Around this time, the Conservancy brought in an outside accounting firm to closely review the organization's finances. In early May, 2024, the Conservancy suspended Smith and shortly thereafter referred the matter to law enforcement for an investigation.

On June 4, 2024, Smith was charged in federal court via Criminal Complaint with bank and wire fraud relating to his criminal conduct at the Conservancy. Smith agreed to waive indictment and was charged via Information with one count of wire fraud and one count of money

laundering on September  24, 2024. Smith pleaded guilty to both charges on November 15, 2024, pursuant to a Rule 11 Plea Agreement. Sentencing is set for April 24, 2025.

## SENTENCING GUIDELINES

The Supreme Court has noted that, in formulating the Sentencing Guidelines, the U.S. Sentencing Commission's goal is to carry out the objectives of 18 U.S.C. § 3553(a). *United States v. Rita*, 551 U.S. 338 (2007). While advisory, the Guidelines remain an important factor in fashioning a just sentence. This is because "it is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives." *Id.* at 350. Moreover, the Guidelines "should be the starting point and the initial benchmark" for choosing a defendant's sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007).

The guideline range in this case is particularly important because, as the Sixth Circuit has noted, "[o]ne of the central reasons for creating the sentencing guidelines was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crime." *United States v. Davis*, 537 F.3d 611, 617

(6th Cir. 2008) (citations omitted). Specifically, Congress was concerned that, prior to enactment of the Sentencing Guidelines, "[m]ajor white collar criminals often [were] sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business." S. REP. 98-225, 76, 1984 U.S.C.C.A.N. 3182, 3259; see also U.S.S.G. Ch. 1 Pt. A(4)(d) ("Under pre guidelines sentencing practice, courts sentenced to probation an inappropriately high percentage of offenders guilty of certain economic crimes. . . . The Commission concluded that the definite prospect of prison, even though the term may be short, will serve as a significant deterrent, particularly when compared with pre-guidelines practice where probation, not prison, was the norm.").

In the plea agreement, the parties jointly recommended under Federal Rule of Criminal Procedure 11(c)(1)(B) that certain guideline provisions apply:

- Section 2B1.1(a)(2): Base offense level of seven;

- Section 2B1.1(b)(1)(L): an additional 22 levels as the loss is between $25,000,000 and $65,000,000;

- Section 2B1.1(b)(9)(A): an additional 2 levels because the offense involved a misrepresentation that defendant was acting on behalf of a charitable organization;

- Section 2B1.1(b)(17)(A): an additional 2 levels because the defendant derived more than $1,000,000 from a financial institution as a result of the offense;

- Section 2S1.1(b)(2)(B): an additional 2 levels because the laundering conviction fell under 18 U.S.C. § 1956;

- Section 2S1.1(b)(3): an additional 2 levels because the offense involved sophisticated laundering;

- Section 3B1.3: an additional 2 levels because offense involved an   abuse of a position of trust.

The Probation Department found that Smith qualifies as a Zero-Point Offender pursuant to USSG §§ 4C1(a)(1)-(10) and reduced his offense level by two levels. Probation also applied a two-level increase for Sophisticated means pursuant to USSG § 2B1.1(b)(10)(C). Smith objects to scoring both USSG § 2B1.1(b)(10)(C) and USSG § 2S1.1(b)(3), arguing that the underlying conduct for both enhancements is the same and that to apply both would amount to double counting.

The government submits that both enhancements are properly scored in this case because there is different conduct by Smith that independently satisfies the requirements for both. While both USSG Sections 2B1.1(b)(10)(C) and § 2S1.1(b)(2)(B) have elements of concealment, both can be scored if the conduct giving rise to the two enhancements is not the same. Indeed, several appellate courts have affirmed that both enhancements are appropriately scored in such a circumstance. *See, e.g. United States v.  Cabrera*, 635 Fed.Appx. 801, 808 (11th Cir. 2015) ("The guidelines do not forbid applying the sophisticated means and sophisticated laundering enhancements together. Instead, they expressly contemplate that the enhancements may be applied cumulatively so long as the conduct that is the basis for applying the sophisticated laundering enhancement is not the only conduct that is the basis for applying the sophisticated means enhancement."); *United States v. Ramcharan*, 83 F. App'x 667, 670–71 (5th Cir. 2003) (same).

The Probation Department reviewed the written objections filed by Smith and the response filed by the government and determined that the conduct for each enhancement is separate and distinct. (PSR, A-5).

Probation's assessment was well-founded based on the facts of this case, and the government concurs in its finding. Smith engaged in sophisticated conduct in two distinct ways. Smith's intricate and elaborate laundering activity, an example of which is set forth in the plea agreement and in the Factual and Procedural Background Section of this memorandum, plainly meets the standard for the sophisticated laundering enhancement. But his conduct concealing his embezzlement from the Conservancy, wholly independent of his laundering of funds, was itself sophisticated and warrants application of the sophisticated means enhancement.

Smith's embezzlement went on for many years, necessitating the regular alteration of Conservancy records to ensure that his misappropriations of Conservancy funds did not show up on the organization's ledger. Smith often falsified invoices, especially invoices from the Michigan Department of Transportation, and would use these false documents to create the appearance of misconduct. Moreover, Smith engaged in an elaborate scheme to obtain a line of credit in the Conservancy's name, based entirely on forged documents, to further conceal his fraud. The Sixth Circuit has affirmed that the use of

fraudulent documents and multi-step processes to carry out and cover up fraud schemes can support the application of the sophisticated means enhancement *See, e.g.*, *United States v. Phelps*, 2021 WL 4315947 at *6 (6th Cir. 2021); *United States v. Simmerman*, 850 F.3d 829, 833 (6th Cir. 2017). Smith certainly did that here, and his offense conduct fully justifies application of the sophisticated means enhancement pursuant to USSG § 2B1.1(b)(10)(C). The government agrees with Probation on this point.

Probation determined that Smith's advisory guideline range is 188-235, based upon a total offense level of 36 and a criminal history category of I. (PSR § 88). The government concurs in this calculation. Based on the factors enunciated in *Gall v. United States*, the government respectfully submits that the starting point here for the Court should be 188-235 months' imprisonment.

## SENTENCING FACTORS – 18 U.S.C. SECTION 3553(a)

Section 3553(a) of the United States Code sets forth a number of factors for the Court to consider in imposing sentence. Those factors include the nature and circumstances of the offense, the history and characteristics of the offender, considerations of both specific and

general deterrence, the need to provide just punishment for the offense and promote respect for the rule of law, and the need to avoid unwarranted sentencing disparities with similarly situated offenders. The government respectfully submits the following observations on those factors and their applicability to the conduct and defendant in the instant case.

    A. <u>The Nature and Circumstances of the Offense</u>

Smith embezzled in excess of 40 million dollars over the span over more than a decade from a major regional nonprofit organization. Both the scale and the duration of the fraud are breathtaking. Knowing this, Smith went through extraordinary efforts to avoid detection, including applying for a multi-million-dollar line of credit using phony loan documents. By any measure Smith's criminal conduct is extremely serious. The losses, both financial and personal, that he inflicted on the Conservancy, the Conservancy's donors, and the Conservancy's employees are massive by any standard.

Moreover, Smith's crime was not a one-time lapse in judgment. Rather, his criminal activity was undertaken on a regular and routine basis for more than a decade. Smith repeatedly made the intentional

and willful decision to steal from the Conservancy. Between January 2013 and February 2024, Smith made 259 wire transfers from the Conservancy's bank account to the account of one of his entities. Smith averaged two transfers per month during the 131 months that he was stealing from the Conservancy —the smallest wire transfer was $21,000 in August 2023, and the largest was $496,000 in August 2013.

As for the money Smith took from the Conservancy to pay his American Express bills, between November 2012 and March 2024, Smith transferred money from the Conservancy to pay his credit card bill on 211 separate occasions. The average monthly credit card payment was $70,852.22 and the total more than 14 million dollars. This means that on 470 separate occasions, Smith made the conscious decision to take money that wasn't his and convert it to his own personal use.

Worse yet, the monthly credit card payments themselves do not reflect the thousands of times Smith used his American Express to support his extravagant lifestyle. Every time he reached for his credit card to pay for food, travel, car payments, and the like, Smith knew that

the money wasn't coming out of his pocket. It was coming from the Conservancy.

Smith compounded his criminal conduct by repeatedly preparing false financial documents to hide his theft. Not only did Smith alter the Conservancy's bank records, but he also created fictitious invoices from MDOT to cover his thefts. Smith even went so far as to fraudulently apply for a line of credit using forged documents, including a bogus authorization from the Conservancy's board. All these steps enabled Smith to conceal his theft for years.

The victim impact statements submitted by employees and board members of the Conservancy make clear the far-reaching significance of Smith's criminal conduct. The victims expressed similar themes of betrayal and greed. Many discussed how the revelation that a trusted friend and employee had stolen from the Conservancy had a profound effect on them personally, fearing being unemployed and often losing sleep. Some of the victims expressed concerns about the loss of trust that residents and donors had placed in the Conservancy. Others talked about how Smith's theft had left them unable to timely pay vendors and construction workers for the work they performed for the Conservancy.

One employee described that while she was pregnant, she lost her medical insurance because the Conservancy could not pay the premiums. Most of the victims felt that because Smith stole from a non-profit organization whose mission was to improve the community, he was really stealing from all of us. As one victim put it:

> Our abandoned industrial waterfront was nothing but broken promises and forgotten dreams. But … a host of philanthropic partners saw something else: we saw possibility. Our community rallied together, matching (Kresge's) initial investment with $110 million more – not just money, but a declaration of faith in Detroit's future. Every dollar represented a family's belief that their children deserved better, that our city deserved better. This is why Mr. Smith's embezzlement cuts so deeply. When he stole from the Conservancy, he didn't just take money – he betrayed the trust of every child who plays along our riverfront, every senior who finds peace watching the sunset over the water, every family who gathers there to celebrate life's precious moments. He betrayed the trust of countless Detroiters who gave what they could, believing in a better tomorrow for our city.

B. <u>History and Characteristics of the Offender</u>

As is the case with many criminal defendants, an assessment of Smith's personal history and characteristics presents a mixed picture. Smith is an intelligent and well-educated individual who plainly possesses substantial skill in his chosen field. His ascension to the role

of Chief Financial Officer of a major local nonprofit organization is a
testament to his capacity and talent in the realm of accounting and
financial management. He has no criminal history, which is to his credit
and is indeed credited in the computation of his sentencing guideline
score. He timely accepted responsibility for his offenses, and the
presentence report notes several statements he has made indicating
substantial remorse for his criminal activity.

However, there are aspects of Smith's history and characteristics
that are not so attractive, and they too should be considered in the
Court's fashioning of a sentence in this case. Two aspects of Smith's
character that were revealed through his criminal conduct especially
stand out. First, Smith's behavior throughout his scheme illustrates a
man with a disquieting comfort with lies and deceptions. As part of his
job duties, Smith regularly had to present data to the Conservancy's
Board regarding the organization's accounts and financial condition.
Smith's representations in these meetings, as he knew full well, were
fabrications. He had created false invoices and fictitious bank
statements to explain expenditures that he made on himself. And Smith
made such false representations to the Conservancy's Board again and

again over the course of his 11-year scheme. The Board was not the only victim of Smith's lies; Smith had to lie regularly to sustain his criminal activity, and he had to lie to all manner of different people to do so. At the end of his scheme, he lied to a Citizen's Bank account manager by representing that he had the authority to take out a line of credit on the Conservancy's behalf, and then he presented false documents to justify his claim. The sheer quantity of lies Smith had to propagate to successfully embezzle over $40 million is perhaps unsurprising, but it is disturbing. Smith's evident comfort with such lies is an indictment of his character that the Court should weigh in its' analysis of this sentencing factor.

Second, Smith's greed is perhaps the most striking character trait revealed by his criminal conduct. As was noted earlier, Smith made an ample salary at the Conservancy and enjoyed a standard of living that many would envy. This was in no way a crime borne out of desperation or necessity. This was a crime borne out of avarice so extreme that it remains difficult to fully grasp. Private jets, suites at NFL games, floor seats at NBA games, over three million dollars in cash transfers to his mistress, luxury vehicles — Smith's appetites were simply insatiable.

And this extravagance was facilitated by money that was not his and indeed was intended for the betterment of the city and community. Smith's greed was extraordinary, and the government respectfully submits that the Court should consider this boundless greed in its assessment of Smith's character.

    C. <u>Seriousness of the Offense, Promotion of Respect for the Law, and Just Punishment for the Offense</u>

A sentence consistent with the government's recommendation of 216 months imprisonment would promote respect for the rule of law and provide just punishment for the offense. It is indisputable that Smith's offense was remarkably serious, given its scope, scale, duration, effect on victims, and effect on the community as a whole. Just punishment for the offense in this case needs to include a serious penal consequence.

A sentence on the upper side of the advisory guideline range, as recommended by the government here, would provide for just punishment and promote public respect for the law, both locally and nationally. An eighteen-year term of incarceration is an undoubtedly significant sentence, but it is one that reflects the seriousness of the

offense and the impact it has had on the community. There is no clear basis on this record for the imposition of a below-guidelines sentence in this case. Considerations such as Smith's loss of reputation and other collateral consequences of his conviction are not appropriate bases to consider in imposing sentence. *See United States v. Bistline*, 665 F.3d 758, 765-66 (6th Cir. 2012) ("were it otherwise, these sorts of consequences—particularly ones related to a defendant's humiliation before his community, neighbors, and friends—would tend to support shorter sentences in cases with defendants from privileged backgrounds, who might have more to lose along these lines.").

Smith has no criminal record, accepted responsibility in a timely fashion, and no doubt has had a positive impact on some of his family and associates over the course of his life. But the parties are not before this Court because of the good that Smith has done in his life, but because of the bad. And the "bad" in this case is simply awful. An assessment of this sentencing factor cuts in favor of a sentence in line with the government's recommended term of incarceration in this case.

D. <u>Adequate Deterrence and Protection of the Public</u>

The government submits that there is little need for specific deterrence as to Smith. As a result of his conviction, it is highly unlikely that he will be employed again in a position of trust or as a financial manager in an organization again. This limits his opportunity to commit a similar offense.

The Court's sentence will, however, serve as general deterrence to others who might consider similar conduct. Imposing a prison sentence on Smith along the lines of the government's recommendation would likely have the laudatory effect of deterring others from engaging in similar conduct in the future. The Sixth Circuit has held that general deterrence has its greatest impact in white collar crimes like the ones Smith committed. This is "[b]ecause economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Peppel,* 707 F.3d 627,637 (6th Cir. 2012) (citations omitted).

And it is this combination that makes general deterrence a particularly important objective in this case. See *United States v.*

*Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."). Smith's take here – over $40 million – was extraordinary. Given the gilded life Smith was able to lead over the course of his scheme, only a significant prison term will impress upon others that such activity is in no way worth the risk.

    E. <u>The Need to Avoid Unwarranted Sentencing Disparities</u>.

    The PSR notes that for the last five years (FY2019-23), after excluding defendants who received a § 5K1.1 substantial assistance departure motion, 100% of the 25 defendants with Smith's offense level and criminal history category received a prison sentence, with the median length of imprisonment being 120 months and the average length of imprisonment being 131 months. (PSR ¶ 119).

    Of course, Smith's case presents a few aggravating factors that may not have been present in a number of the other cases included in this analysis. Smith stole from a charitable institution. He did so

systematically over a period of many years. He abused the trust of the Conservancy's Board, employees, donors, and the public in doing so. And he expended the stolen funds in a manner so extravagant as to be almost incomprehensible. There is no excuse for Smith's actions and no mitigating factors that provide a tangible basis for a variance from the sentencing guidelines in this case. A sentence consistent with the government's recommendation in this case is fully warranted by the facts and circumstances of Smith's offense and would not present any <u>unwarranted</u> sentencing disparity with other offenders.

## CONCLUSION

The government respectfully submits that a sentence of 216 months incarceration is appropriate in this case. Such a sentence is within the advisory guidelines range and would appropriately weigh the nature and circumstances of the offense and Smith's history and characteristics, would promote respect for the rule of law and provide just punishment, would deter other would-be offenders from engaging in anything approximating Smith's conduct, and would not create an unwarranted sentencing disparity with other offenders. The

government therefore recommends that the Court impose a term of

incarceration at this level, along with a three-year term of supervised

release. The government will also ask for the imposition of restitution in

an amount to be determined at sentencing but no less than $44.3

million, along with the entry of an order of forfeiture.


Respectfully Submitted,

Julie A. Beck
Acting United States Attorney


*s/John K. Neal*
John K. Neal
Robert A. Moran
Assistant United States Attorneys
211 W. Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9100

CERTIFICATE OF SERVICE

I certify that on Thursday, April 10, 2025, I electronically filed the

foregoing document with the Clerk of the Court using the CM/ECF

system, which will send notification of such filing to the attorneys of

record.


s/ *Robert A. Moran*
Robert A. Moran
Assistant United States Attorney