## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

     Plaintiff,

vs                             Case No. 2:24-cr-20532

WILLIAM A. SMITH,            Hon. Susan DeClercq

     Defendant.

_____

## DEFENDANT WILLIAM A. SMITH'S SENTENING MEMORANDUM

### I.   Introduction

Defendant William A. Smith ("Mr. Smith" or "Defendant") stands before this Court convicted of two serious crimes.  On November 15, 2014, Mr. Smith appeared with counsel before this Honorable Court and entered a plea to Counts I and II of the Information. This plea was accompanied by a Rule 11 Plea Agreement, which the Court took under advisement.

### II.   Background

#### A. Procedural History

Mr. Smith's guilty plea was to Count I, wire fraud, in violation of 18 USC § 1343 and Count II, laundering of monetary instruments in violation of 18 USC § 1956(a)(1)(B)(i). The charges in this case are a result of Defendant's embezzlement

of funds from the Detroit Riverfront Conservancy ("DRFC") over approximately a 12-year period. The parties have no dispute as to guidelines except as to "sophisticated means" enhancement pursuant to USSG § 2S1.1(b)(3).

Mr. Smith objects to the collective application of USSG §2B1.1(b)(10)c and USSG § 2S1.1(b)2(b).[1] *Id.*, ¶¶ 34, 35. While the sentencing guidelines do not forbid applying the sophisticated means and the sophisticated laundering together, *United States v. Cabera*, 635 Fed Appx 801, 808 (11th Cir. 2015), the sentencing guidelines expressly contemplate that the enhancements may be applied cumulatively so long as the conduct that is the basis for applying the sophisticated laundering enhancement is not the only conduct that is the basis for applying the sophisticated means enhancement. U.S.S.G. §2S 1.1(b)(3) and CMT. 5(B). Indeed, the sentencing guidelines provide that the application of both sophisticated means and sophisticated laundering is improper when the same conduct forms the basis of each enhancement. *United States v. Mehmood*, 742 Fed. Appx. 928, 943 (6th Cir. 2018), citing U.S.S.G. §2S1.1, n. 5(B) ("if subsection b3 applies, in the conduct that forms the basis for an enhancement under the guideline applicable to the underlying offense is the only conduct that forms the basis for application of subsection b3 of this guideline, do not apply to subsection b3 of this guideline").

---

[1] Mr. Smith preserved this objection to the sentencing guideline scoring by timely filing an objection with the Probation Department.

Here, Mr. Smith objects to the Probation Department's application of both sophisticated means and sophisticated laundering, specifically where it found that both:

> Applying two level enhancement for use of sophisticated means pursuant to USSG § 2B1.1(b)(10) because Smith provided altered bank statements which caused the inflated unavailable balance in the account, replace the transactions involving American Express ACH payments and wire transfers to the Joseph Group with other fictious information; and Smith maintained two ledgers and created and provided notices in order to conceal his fraudulent conduct. This conduct is separate from the methods used to apply the sophisticated laundry enhancement. For the sophisticated laundering enhancement, the Defendant transferred conservancy funds to several business entities owned and then the funds were transferred to another business, again by Smith. The Defendant transferred through multiple bank accounts and provided fraudulent financial statements to the staff accountant to hide his theft. **Id**., ¶ 90.

Mr. Smith objects to this finding because there is not any reasonable distinction or delineation in Mr. Smith's conduct sufficient to find that he engaged in different conduct necessary to support application of the sophisticated means and sophisticated laundering enhancements in this case. Further, the finding is flawed since Mr. Smith's scheme to defraud the Detroit Riverfront Conservancy was part of a singular plan and operation, and as such, the sophisticated laundering is sufficient to cover those activities. Where the Rule 11 Plea Agreement provides that the parties jointly recommend that they will recommend the sophisticated laundering

3

enhancement applies (and the Probation Department found that it does), the sophisticated means enhancement should not also apply. Thus, there should be a two-point reduction in Mr. Smith's overall offense level and the resulting guideline range should be151 to 188 months.

### B. Presentence Investigation Report

The Probation Department in its guideline calculations has accepted the Government's view of the "sophisticated means" enhancement, and as a result has computed the Defendant's guideline range as a total offense level 36. Since the Defendant's criminal history score is zero (0), the Probation Department computes his guideline range as criminal history category 1, offense level 36 for a guideline range of 188 months to 235 months. If this Court's sustains the Defendant's objection to the "sophisticated means" enhancement the Defendant's guideline range would still be as a criminal history of one (1) level 34, 151 months to 188 months. The Presentence Investigation Report ("PSR") documents that the Defendant has agreed pursuant to the Rule 11 Plea Agreement that the amount of loss in this case that is directly attributable to Mr. Smith's conduct is at least $44 million dollars,  and was a result of a serious abuse of trust involving the Defendant taking advantage of his position as Chief Financial Officer of the DRFC.

The PSR points out that the Defendant is a lifelong resident of the Detroit area and was raised by an intact family. While both of his parents are still alive, both

suffer from physical infirmities including his mother being a two-time breast cancer survivor. **PSR ¶51**. The PSR documents that the Defendant has been married for over 20 years, and his wife is currently unemployed and that their 21-year old daughter attends Prairie View A&M University in Prairie View, Texas. **PSR ¶54**. The PSR points out that Mr. Smith's parents described him as a "decent and good man" who looked out for the neighborhood and showed compassion for others and played a mentor role for youth in the local basketball club that he started. **PSR ¶56**. His parents confirmed that they knew nothing about his fraud and that they were surprised by the conduct given rise to his instant offense. "His mother indicates she does not know where this came from." **PSR ¶56**. The report documents that the Defendant acknowledges that his conduct has made his family "extremely insecure". Further, when asked his feelings about his conduct, he indicated "I want the judge to know that I am extremely remorseful and want the opportunity to work to get the victims as close to whole as possible. I am ashamed of what I've done to the city and the project that I love. This behavior is something that I will never show again. My intentions are to continue to work to restore the trust and respect of the community that I let down." **PSR ¶57**. The PSR documents that it is Mr. Smith's hope that when he is released from custody that he can continue to be active in helping youth. **PSR ¶58**. The PSR documents Mr. Smith's medical issues including the fact that he has been legally blind in his left eye since childhood, and the medications that he is

5

prescribed for his various medical ailments. **PSR ¶¶60 and 61.** The PSR also documents Mr. Smith being currently under the care of a psychiatrist for mental health treatment. **PSR ¶¶68 and 69**. The PSR also confirms Mr. Smith's   ACE scores as being zero (0). **PSR ¶72**. The PSR also documents the Defendant's alcohol abuse. **PSR ¶¶73-76**, and the Defendant's educational background and employment history, which includes Mr. Smith having a Bachelor's degree in business administration and accounting and a Master's degree in business administration from Wayne State University. Mr. Smith also attended a Harvard leadership program in June of 2023. **PSR ¶78.**

## III.   Sentencing Framework

### A.   Governing Law

Prior to imposing a sentence, this Court will calculate the advisory guideline range, and give "both parties the opportunity to argue for whatever sentence they deem appropriate and consider all of the §3553(a) factors to determine whether they support a request of the parties." *United States v. Gall*, 522 U.S. 38, 49-50 (2000).

Thereafter, the Court must "mold an individualized assessment based on the facts presented, regardless of whether the sentence is above, below, or within the guidelines." *Gall*, 522 U.S. at 50.

Under §3553(a), the sentencing guideline range should be the "initial benchmark" or "starting point to help the district court craft" a sentence sufficient,

but not greater than necessary, to comply with the purposes of sentencing described in the sentencing factors of 3553(a). *Id.*, at 50, n 6. A party "may argue within the Guideline's framework for a departure, or a party may argue that independent of the Guidelines application of the factors set forth in 18 U.S.C §3553(a) warrants a different sentence." *Rita v. United States*, 551 U.S. 338, 344 (2007). There is no limit to what kind of variance a court may determine is justified under the sentencing factors. *Irizarry v. United States*, 553 U.S. 708, 715 (2008). Moreover, a guideline sentence is not presumed to be reasonable in trial courts, which unlike courts of appeal, do not enjoy the benefits of a legal presumption that the guidelines sentence should apply. *Nelson v. United States*, 129 S. Ct. 890 (2009) (per curiam); *Rita v. United States,* 551 U.S. 338 (2007); *United States v. Cardi,* 520 F.3d 984, 981(9th Cir. 2008).

Indeed, courts may consider a number of factors in determining an appropriate sentence under §3553(a). "Sentencing is an art not to be performed as a mechanical process but as a sensitive response to a particular person who has a particular personal history and has committed a particular crime." *United States v. Harris*, 679 F.3d 1179, 1183 (9th Cir. 2009). "The sentencing court must not be so appalled by the offense that it loses sight of the offender" and "the record must reflect the required consideration of the history and characteristics of the defendant under 18 USC §3553(a)." *United States v. Vonner*, 516 F.3d 382, 392 (6th Cir. 2008).

7

As such, the overarching duty of the sentencing court is to "impose a sentence sufficient, but not greater than necessary to accomplish the goals of sentencings." *Kimbrough v United States*, 552 U.S. 85, 49-50, 53-60 (2007); *Pepper v United States*, 131 S.Ct. 1229, 1242-43(2011). This "parsimony provision" is not simply a factor to be considered in determining the sentence; it represents a limit the court is statutorily prohibited from exceeding-even when a greater sentence is recommended by the sentencing guidelines. *United States v Foreman*, 436 F.3d 638 (6th Cir. 2006). Again, while the sentencing guidelines are a starting point, they "are not the only consideration". See *Gall v United States*, 1386 S. Ct. 586, 596-97 (2007).

### B. 18 U.S.C. § 3553a Factors as applied to Mr. Smith

#### 1. (a)(1) The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

This is a fraud case that involves a very significant loss amount. Mr. Smith acted alone in this very serious offense and he cooperated and confessed his involvement at the time of his arrest, and the Government was able to proceed by information without having to go to grand jury and subpoena witnesses against the Defendant. He relieved the Government of other, more extensive efforts that would have been required to put the case together against him. He instead chose, at their request, to meet with them and to be debriefed multiple times for multiple hours and providing extensive details of his wrongful acts which aided the Government in

prosecuting him and which assisted in uncovering the assets and assisted in informing the Government of the details of his wrongful conduct. This not only aided and speeded up their investigation but also enabled them to inform the DRFC of the particulars of his wrongful conduct in a way that would aid them in protecting the DRFC and similar institutions going forward. Mr. Smith's conduct is consistent with his clearly expressed remorse, which he expressed to the Government and to Probation. Probation also documented the Defendant's extensive history of alcohol abuse and his current depressive disorder, for which he is receiving treatment.

The Defendant has no prior criminal record and has extensive and substantial community ties, which demonstrate his positive impact on the lives of others as illuminated by the numerous letters of support filed with this memorandum.

### 2. To Reflect the Seriousness of Offense, To Promote Respect for the Law, and to Provide Just Punishment for Offense.

As mentioned above, this offense is serious and requires adequate punishment.

### 3. A(2)(B) To afford Adequate Deterrence of Criminal Conduct

Because of the Defendant's lack of any prior record and background, any sentence of incarceration will provide adequate deterrence in this case.

**4. A(2)(c) To Protect the Public from further Crimes of the Defendant.**

As stated above, the Defendant has no prior criminal history and the extremely public nature of this offense, together with his age, (52) makes the possibility of reoffending extremely unlikely, particularly, since the possibility of the Defendant being employed in a position of trust is next to none at this point. Therefore, it's safe to conclude that Mr. Smith poses low risk of recidivism. The Sentencing Commission's studies show that several factors correlate with reduced recidivism. These include age, employment, education, family support, abstinence from drug use, and the nonviolent nature of the offense. *See U.S. Sentencing Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (May 2004).

Mr. Smith's educational background makes him employable. He is 52 years old. Thus, he is well past the critical cutoff psychologists denote as a milestone for limiting risky and criminal behavior. *Too Old To Commit Crime,* [https://www.themarshallproject.org/2015/03/20/too-old-to-commit-crime](https://www.themarshallproject.org/2015/03/20/too-old-to-commit-crime).

**5. (a)(2)(D) To Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner**

The Defendant is unlikely to be able to work in his chosen field of employment because of the extensive negative media coverage of this offense. Mr.

10

Smith requires treatment for his history of alcohol abuse as part of being sentenced. He has indicated that he would be willing to be retrained in any area, including vocational training that would allow him to gain employment at some point so that he can continue to repay the victims in this matter.

### 6. a(3) The Kinds of Sentences Available.

Probation and the Government calculate the guideline range as 188 to 235 months. The Defendant argues for a guideline range of 151 months to 188 months. While probation is statutorily permissible in this case, Mr. Smith acknowledges that probation is likely an inappropriate sentence in this case.

### 7. a(6) The Need to Avoid Unwarranted Sentencing Disparities Among Defendants with Similar Records Who Have Been Guilty of Similar Conduct.

The Government argues that the Defendant should receive a sentence just below the statutory maximum, notwithstanding his lack of any criminal record, his cooperation with the Government in this case, both with respect to providing them with information and also agreeing to a creditor's examination, and in addition to having actively engaged in efforts to liquidate assets and surrender them to the Government.  The Probation Department has referenced in its report the U.S. Sentencing Commission's JSIN database information describes median and average sentences final offense level of 36 and criminal history category of 1 excluding defendants who received substantial assistance under Section 5k1.1 of the

11

sentencing guidelines  for 25 defendants who received imprisonment in whole or in part, the average length of imprisonment imposed was 131 months and the median length of imprisonment imposed was 120 months.

The United States Sentencing Commission (U.S.S.C.) maintains a comprehensive, computerized data collection system of federal sentencing information which includes, among other things: (1) the judgment and commitment order; (2) the statement of reasons (including the reasons for any departures or variances); (3) any plea agreement; and (4) the indictment or other charging document.  The U.S.S.C estimates that 99% of all cases are included in this data set. The U.S.S.C. publishes on its website its annual Sourcebook which contains sentencing statistics for broad categories of offenses.  It does not, however, contain a breakdown based on loss amount which is the single most important factor in determining the appropriate guideline range in cases involving fraud.

Relying on JSIN, the PSIR stated that for 25 defendants sentenced with a primary guideline of USSG § 2S1.1, an offense level of 36, and criminal history category of I, the average length of imprisonment was 131 months and the median length of imprisonment was 120 months. PSIR, ¶ 119.

JSIN has many shortcomings, most significantly it often captures cases that have characteristics that are not applicable to a particular defendant.  For instance, in Mr. Smith's case, JSIN's findings are based on defendants scored according to

12

USSG §2S1.1. **Exhibit 1, MCM Report**, p.2. However, JSIN is not able to isolate those USSG §2S1.1 cases where the Base Offense Level is calculated using USSG §2B1.1. **Id**. Thus, these JSIN findings contained in paragraph 119 of the PSR include cases where the Base Offense Level was calculated using a variety of different guidelines such as the drug guideline or bribery guidelines. These JSIN findings also contained defendants who went to trial or had some criminal history points. Id., p. 2.

Using the loss figures under U.S.S.G. § 2S1.1/§ 2B1.1, MCM did analysis of sentences imposed upon defendants between Fiscal Year 2019 and Fiscal Year 2023 under the guidelines as calculated in the PSIR. Id., pp. 2-3.

For the 4 similarly situated cases (i.e., defendants who accepted responsibility, had no criminal history, and were scored with a base offense level under USSG § 2B1.1) scored under USSG § 2S1.1/§ 2B1.1, the median sentence was 87.5 months and the average sentence was 100.5 months. Id., p. 3.

**8. (a)(7) The Need to Provide Restitution to Any Victims of this Offense.**

As mentioned, the Defendant has agreed to provide full restitution already commenced.

**IV.   Defendant's Family and Community Activities**

While the Government has been interested in only presenting one side of the Defendant's history, it is clear that he is more than just a person who stands convicted of two very serious crimes rooted in a breach of trust. In order to sentence the Defendant, this Court should have a complete picture of his background including family and community activities, in particular, community support. It should be noted that because of the significant media attention that has been devoted to this case and press relations that the DRFC's high-profile board members and executives enjoy, the Defendant has become a pariah in many ways in his own community. As such, while a number of people who the Defendant has helped have declined to step forward because of fear of personal and political recriminations, nonetheless, a number of people in his life felt constrained to inform this Court of other factors that bear on his background and character. A number of people wrote letters to this Court that are attached as exhibits to this memorandum. These letters "flesh out" and give a more complete picture of Mr. Smith's background, personal history and character.

Iman S. Hoggard (**Exhibit 2**) wrote a letter to this Court and indicates, among other things, that "Despite his mishaps I can't view him in another light. I have watched him firsthand help people that who were truly in need. I've witnessed him

14

single handedly change people's lives." Mr. Hoggard goes on to point out that the Defendant made serious mistakes but that he believes he "has great remorse."

Gabrielle Wiggins, (**Exhibit 3**) a local recording artist, (recording name Brielle  Lesley) indicates that she has known Mr. Smith since she was 17 years old and described his efforts to help her advance in her own career both as a performer and as a former employee of Duo's Lounge that the Defendant owned until recently. "He has created opportunities where none existed, offered second chances to those society had given up on, and provided stability to those who had nowhere else to turn. He has employed people who were down on their luck, mentored those searching for purpose and fed those who didn't know where their next meal would come from. He has given shelter to the homeless, guidance to the lost and unconditional support to anyone in need, and never once asking for anything in return." Ms. Wiggins goes on to describe how after she lost her father in 2014, how Mr. Smith was a mentor and supporter of hers and helped her through difficult times.

Niambi Blair, (**Exhibit 4**) who is a former Duo's employee, also, indicated that he created a "collaborative working environment where every team member felt valued and empowered".

Timmora Jackson's (**Exhibit 5**) letter states that "I genuinely  believe that William feels both embarrassment and deep remorse regarding this matter. It saddens me greatly to see a man who has dedicated himself to helping others grow

mentally, spiritually, and emotionally being subjected to judgment and criticism". She goes on to talk about help he gave her 15-year old son and then points out "I recognize that the offense he is being accused of is serious, and I do not seek leniency without a careful consideration of the circumstances. William is the kind of person who would selflessly extend help to his peers".

Frank Simmons, III **(Exhibit 6)** stated that "Mr. Smith provided so many opportunities! Especially when Covid 19 struck the world. While many employers let go of workers. Mr. Smith made sure we were taken care of. That meant a lot to me especially during one of the roughest periods of life."

Terrence Bland **(Exhibit 7)** who went to high school with Mr. Smith and has known him for more than 30 years stated, "I'm not surprised that he has accepted responsibility for his actions. My friend has expressed his deep sense of remorse for his serious mistakes. I can say with great authority that William A. Smith will do anything to repay his debt to society and emerge as a changed man."

Donovan Jones **(Exhibit 8)** who graduated from law school, wrote a letter to the Court indicating that he was the first person from his family to graduate from law school and that was directly attributable to the encouragement and support and guidance that Mr. Smith gave him because he had struggled with grades and test scores.

Tanya Harris (**Exhibit 9**) has known Mr. Smith since childhood and describes him helping her nephew who was struggling with accounting by tutoring him and being a mentor. "He drew out the best in my nephew and it was appreciated". "Although William has made a terrible mistake, I know he is incredibly remorseful, and willing to do whatever it takes to make reparations, for his actions". She goes on to say "I do not believe that he should get off without punishment. I just hope that you will recognize the power you yield regarding the future of a man who has led an exemplary life. I believe in second chances, and I pray that you do too!"

Patrice Spears (**Exhibit 10**) indicated that she worked at Duo's restaurant for six years and that Mr. Smith took a chance on her even though she was a person with no experience when no one else would hire her.

Ms. Secret Harris (**Exhibit 11**) is someone Mr. Smith helped "young wild girl become a woman." Her letter states, "I never had anyone in my life who always wanted to see someone elevate and do good with themselves outside of my family. When I met him, I always ask everybody around me like why is this man so hard on me always on my head. Until I asked him myself and he said "Secret I see so much more for you and I see you exceling in life in ways you probably haven't yet". "He taught me responsibility he taught me patience." She went on to describe how he would use Duo's Restaurant and Lounge as an opportunity to teach other people

skills. "Even on days we were closed he open his door for educational reasons to help young men and women better themselves."

Darlene Adams (**Exhibit 12**) who has been a probation officer for 30 years, says she almost never writes letters of consideration to court on behalf of friends. "I understand the seriousness of this offense however I also know the person who is before the court". She goes on to describe the Defendant as someone who has been pivotal in the revitalization of our community. "He is valuable member of society and deserves leniency in his current legal situation."

Ashley Perry  (**Exhibit 13**) is another person who says she was mentored by William Smith. "He spent hundreds of hours at his desk answering every minute question I had about any aspect of business and investing. She goes on to say, "he took us all under his wing, and now we are wind beneath his. He changed our lives through compassion and leadership, and I pray that you all have compassion toward him in your judgement."

Alliya Johnson (**Exhibit 14**) in her letter points out that even though when she applied for a job at Duo's Restaurant, they were fully staffed, Mr. Smith still "welcomed me to the Duo family and made room for me."

Jordan Jackson (**Exhibit 15**) talks about Mr. Smith helped his family save their home that they had lost for property taxes, "not only through practical means but also through emotional support and guidance."

18

Carlos Medlock (**Exhibit 16**) indicated, "I met William Smith when I was 16 years old, during a pivotal time in my life. He became more than just a coach to me. He became a mentor and a father figure. He taught invaluable lessons about responsibility, integrity and compassion. His guidance helped me understand what it means to be a man, to raise a family, and to be a positive force in the lives of others. His influence inspired my own career path as I now dedicate my life to working with kids."

Shereef Telfaire (**Exhibit 17**) indicated in his letter, among other things, "First and foremost, I would like to acknowledge the seriousness of the offense and the consequences of such actions. However, it is important to share that I have known William to be a thoughtful, generous, and kindhearted individual who has shown genuine concern for others." The letter goes on to describe how Smith, "worked tirelessly to create opportunities for individuals who might otherwise struggle to find meaningful employment."

Javonda Floyd, (**Exhibit 18**) who worked Duo's for eight years,  states in her letter, "I've been working for Duo's for eight years and my family has been involved with him for well over a decade". It goes on to say that "due to Mr. Smith's input and education athletic influence within the youth of her community that directly impacted her brother and other members of her family. William gave me an

opportunity to work with him at his establishment to provide for my family." It goes on to note other contributions that he has made to the community.

Shanitra Gibson (**Exhibit 19**) described Mr. Smith's impact as positive and states, "as a single mother raising boys it has been tough to say the least. After I shared some of the struggles of raising teenage boys, Will offered me advice that later proved beneficial as his advice as helped my boys to stay on track". She goes on to say, "I can confidently say he is one of the most incredible individuals I have ever had the pleasure of knowing as he chooses to be kind, choses to care and praise his best energy daily."

## V.   William Smith's Post-Event, Conduct and Cooperation

Since his arrest in this matter, Defendant William Smith has evidenced his remorse and desire for rehabilitation by his extensive and unfettered cooperation with the Government in this matter. This cooperation has taken two forms: (a) meeting with the Government and debriefing in detail on multiple occasions for several hours in each occasion to discuss the details of his involvement,  and providing where possible, explanations for how he was able to execute his crime that would help both the DRFC and law enforcement take preventive steps to protect the DRFC and other similar institutions and organizations, (b) and cooperating in the Government's efforts to uncover known and unknown assets that can be used to take steps toward restitution, and in some instances, even bringing to the attention of the

Government the existence of assets which they were unaware. He has also actively arranged the sale and liquidation of assets toward that end. He has actively participated in the negotiation of the sale of real estate and other matters so that these liquidated assets could be turned over to the Government for the benefit of the DRFC.  The Government filed an action for injunctive relief prior to Defendant's plea and Mr. Smith did not choose to resist this action but in fact, cooperated with it, resulting in a temporary restraining order and ultimately consenting to a preliminary injunction regarding these assets.  Even with respect to the civil action brought by the DRFC, while this of necessity had to be monitored by his attorneys and required their interaction, he has gone out of his way to not resist their efforts to collect from him what they are rightfully entitled. After having done all of the above, the Defendant even completed a creditor's exam for the Government to take an even deeper dive into his life to ensure that available assets that may exist can be turned over to the Government in this case for the benefit of the DRFC. It is unfortunate that even though the Government (without having made any promises to the Defendant) has nonetheless, in its presentation to the Court, not even made mention of this cooperation which they sought and received from the Defendant.  In this case, the Government took the extraordinary step of filing a complaint for preliminary injunction including a temporary restraining order. *United States v Smith*, U.S.D.C., Eastern District Case No. 2:24-cv-11625. Understand the devastating economic

21

impact this action had on Mr. Smith and his family,  Mr. Smith nonetheless stipulated to entry of the temporary order and chose not to contest it even though it inadequately provided for living expenses during the pendency of this matter and interfered with his ability to pay his attorneys, he nonetheless put the DRFC's interest above his own and agreed to the injunctive relief sought by the Government and the entry of a consent preliminary injunction in this matter. **(ECF No. 1)**. Although the injunction has wreaked havoc on him personally and on his family and friends, Mr. Smith has nonetheless chosen to cooperate in this matter and has aided the Government, recognizing that this was a collateral consequence of his own conduct.

It is well established that even when a defendant's cooperation does not rise to a level of "substantial assistance", the court may and should consider that cooperation to fashion the sentence of the defendant. *U.S. v Edmiston, Jr.*, 324 Fed. Appx 496 (6th Cir. 2011). Such efforts by the defendant are "a critical part of the history and characteristics of a defendant that Congress intended sentencing courts to consider." *Pepper v United States*, 562 U.S. 476, 492 (2011). Not only does this conduct give the "most up-to-date picture" of the defendant, but it also "sheds light on the likelihood that he would engage in future criminal conduct". Id.

It is rather unusual for a defendant to debrief with the Government when there is no intention on behalf of the defendant or the Government that he provide information regarding the prosecution of others for purposes of substantial

22

assistance. Mr. Smith had no such goal or objective; his only goal was to give the Government an opportunity to question him in detail about his conduct to the extent that he could to help provide them with information that would benefit the DRFC and other institutions. For example, in *Gall*, the district court sentenced the defendant to probation, citing his post-events, rehabilitation and strong family support. 552 U.S. at 43-44. The Supreme Court upheld this reasoning, concluding that the sentencing court "reasonably attached great weight" to defendant's rehabilitation because it lent "strong support to the conclusion that imprisonment was not necessary". Id at 59; See also *United States v Harriston*, 502 F.3d 378, 381-82 (6th Cir. 2007) (upholding a below guidelines sentencing based on defendant's post-events, employment, and support of his children, an effort to avoid "the drug culture"). Moreover, in *Edmiston*, the court held that it was proper for the district court in fashioning a sentence to consider among other things the defendant's otherwise unblemished criminal history and cooperation with authorities in fashioning a sentence below the advisory guideline range.

## VI.    Conclusion

It is said that sentencing is one of the most difficult tasks that a judge undertakes. The power to strip a person of his or her liberty in the name of punishment is an incredible responsibility. It requires judges to fashion sentences that are sufficient but not greater than necessary by balancing the goals of

punishment against the individual's history and characteristics. In other words, a court's sentence must reflect consideration of the unique personal characteristics of the defendant along with community safety, respect for the law, deterrence, and rehabilitation. While the factors of 18 USC 3553a attempt to embrace this responsibility, ultimately it is a difficult one and one that requires careful consideration and deliberation by the court. In this case, the behavior and conduct of the Defendant is extremely serious. It is accompanied by the challenges of the high-profile nature of the victim in this matter, DRFC, which has the capacity to attract media attention and because of the nature of the organization's mission and because many in its leadership are well known community leaders with their own public platforms. As such, the magnitude of their voices have resounded throughout this community and their cries for punishment have echoed throughout the community in ways that are rarely seen in such cases.

The Government has sought to create a one-dimensional image of Mr. Smith in its effort to convince this Court to give the Defendant a sentence barely below the statutory maximum in this matter. This proposed sentence is clearly out of proportion to the circumstances of this case. The Defendant's conduct requires punishment, but the Defendant should not receive more punishment than the law requires or is necessary merely because the victim's voice is amplified by the media and because the DRFC includes many influential and important voices in this

24

community. We believe the Court should give proper consideration to all of the factors in this case including Defendant's conduct. This Court should not, and we believe, cannot ignore the other factors in the Defendant's background and in his conduct in this case since he was charged.  The Government's request is excessive and far more than is necessary to achieve the ends of 18 USC 3553a in this matter. The Court should take into consideration all of the required factors and to give the proper weight to each in this matter. We ask the Court to impose a fair sentence and a just sentence and not one driven by sensationalism and other improper influences.

Respectfully submitted,


s/Gerald K. Evelyn
Gerald K. Evelyn (P29182)
Attorney for Defendant
409 East Jefferson Ave., Ste. 500
Detroit, MI 48226
(313) 962-3500
geraldevelyn@yahoo.com

s/Robert E. Higbee
Robert E. Higbee (P82739)
Attorney for Defendant
409 East Jefferson Ave., Ste. 500
Detroit, MI 48226
(313) 962-3500
robhigbee@gmail.com

April 17, 2025

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 17, 2025, I electronically filed the above document(s) with the Clerk of the Court using the ECF System, which will provide electronic copies to counsel of record.

/s/Gerald K. Evelyn
Gerald K. Evelyn (P29182)
Attorney for Defendant
409 East Jefferson Ave., Ste. 500
Detroit, MI 48226
(313) 962-3500
geraldevelyne@yahoo.com